KENNEDY, Justice
(dissenting).
Because the main opinion seems to be more interested in providing social commentary than in protecting the best interests of these parties’ two children, I dissent.
In an apparent attempt to play to public opinion, the main opinion has ignored the sound reasoning of the Court of Civil Appeals and has mischaracterized much of the evidence presented in this ease.[3] In fact, one reading the main opinion may get the impression that the trial court’s decision is supported by a wealth of evidence. However, I can find no evidence to support the type of severe visitation restraints placed on R.W., especially when viewed in light of D.W.W.’s documented history of alcoholism and abuse. While I am not attempting to condone R.W.’s lifestyle, I cannot ignore the fact that the trial court’s decision appears to be founded primarily on prejudice.
Drawing from the record, I find the following evidence equally relevant to the best interests of these children; that this evidence was not addressed by the trial court or in today’s main opinion, however, tells more about what I perceive to be the true motive behind the restrictions placed on R.W.’s visitation privileges:
1) D.W.W. has a history of serious alcohol abuse and violence.
2) D.W.W. had received numerous D.U.I. citations before his marriage, one while R.W. was pregnant with their first child, and one during the pen-dency of this action.
3) D.W.W. ran into a tree stump, total-ling his car, while driving intoxicated with his daughter in the vehicle. She was 23 months old at the time and was not secured in a child safety seat.
4) D.W.W. has been charged with domestic abuse on three occasions, and R.W. testified that there were many unreported incidents of abuse during their 10-year marriage.
5) In one offense report, the police cited D.W.W. for third-degree assault and described him as “highly intoxicated and using abusive language.” In another report, D.W.W. was arrested for third-degree assault and, on that occasion, the police noted a bruise on R.W.’s left eye and were forced to apprehend D.W.W. after he fled the scene on foot. Despite this evidence and a guilty plea on one assault charge, D.W.W. testified that he has never hit his wife.
6) On one occasion, D.W.W. closed his infant son in a clothes dryer.
7) D.W.W. has consistently demonstrated his willingness to disparage R.W. in front of the children and to use them as pawns in this dispute.
8) D.W.W. has threatened to kill R.W., the children, and others.
9) On several occasions, the daughter’s school complained about her personal hygiene and manners following her weekend visits with D.W.W. D.W.W. also allegedly increased his son’s Ritalin dosage without consulting the child’s physician.
*798 10) The children often returned from D.W.W.’s house with flea bites, and both contracted scabies after visiting their father.
11) Although D.W.W. had been ordered to pay child support, the mortgage on the marital home, and half of the children’s daycare bill, the home mortgage remained in default throughout this proceeding and the children’s daycare facility had to sue to collect the unpaid balance.
In an effort to buttress the trial court’s reasoning, the main opinion ignores the past effects of D.W.W.’s behavior on the children and argues that the children have been adversely affected by their mother’s relationship with N.L. In reality, many of the children’s learning and behavioral difficulties began before R.W. separated from D.W.W. and therefore could not be attributed to R.W.’s relationship with N.L., as the main opinion implies. The evidence showed that the children had excelled in school over the year and a half they were in their mother’s custody, and that N.L., who is a child guidance counselor, had spent many hours working with the parties’ daughter to improve her spelling and her motor skills.[4] The main opinion also states that R.W. has shown impatience with her children in the past. However, the record indicates that R.W. spanks the children less often than D.W.W. does, and that the marks on the daughter, addressed in the main opinion, actually occurred when R.W. grabbed the daughter’s arm to rescue her from drowning in the deep end of a pool.
The main opinion’s true emphasis seems to be on the supposed illegal nature of R.W.’s lifestyle, and it goes to great lengths to paint a radical picture of R.W.[5] The main opinion questions R.W.’s parental fitness, based on the alleged criminal nature of her relationship with N.L. Despite a complete lack of evidence regarding the specifies of R.W.’s sex life, the main opinion accuses R.W. of “continually engaging in conduct that violates the criminal law of this state,” 717 So.2d at 796, and suggests that lesbianism, in general, is illegal under § 13A-6-65(a)(3), Ala.Code 1975. Under § 13A-6-65(a)(3), Ala.Code 1975, anyone who engages in oral sex with a person to whom they are not married, regardless of the gender of the persons involved, is guilty of sexual misconduct. Ignoring the presumptuous nature of its allegation, I am bothered by the main opinion’s implication that a violation of this statute is tantamount to parental unfitness. Nevertheless, the main opinion’s fixation with this particular aspect of R.W.’s life further illustrates my concern that these children’s best interests are not the primary focus of today’s decision. In reality, the children are far more likely to be traumatized and injured by their father’s illegal activities than they are by any potential violation of § 13A-6-65(a)(3), Ala.Code 1975.
I believe the trial court abused its discretion by severely limiting R.W.’s visitation, while granting full custody to D.W.W. The main opinion accuses me of dealing with issues outside the scope of this review; however, our role is to determine whether the Court of Civil Appeals erred in concluding that the trial court’s order was not supported by the evidence. This necessarily involves reviewing the foundation of the trial court’s order and, although that order is entitled to a presumption of correctness, I cannot support a judgment that appears to be influenced more by prejudice than by the facts. Prejudice is not within the discretion of the trial court and, in reviewing the record, I find no reason, other than prejudice, to explain the trial court’s willingness to ignore D.W.W.’s outrageous conduct while so severely restricting R.W.’s visitation. Unfortunately, those joining the main opinion, in their own haste to separate these children from their *799 mother’s lifestyle, seem just as willing to vilify R.W. while ignoring D.W.W.’s proven history of alcoholism and abuse. I can find no valid basis to reverse the judgment of the Court of Civil Appeals; therefore, I must dissent.[6]

. The main opinion states that the Court of Civil Appeals "relied primarily" upon several statements made by the trial court. However, the Court of Civil Appeals specifically stated that it could "find no apparent valid basis for the restrictive visitation requirements imposed upon the mother," R.W. v. D.W.W., 717 So.2d 790 (Ala.Civ.App.1997), and that this lack of evidence was only further buttressed by the trial court’s statements.

. The children’s report cards, along with several awards for effort and citizenship, were admitted into evidence at the hearing. In addition, there was no evidence that the children, as the main opinion states, had "required psychiatric counseling,” 717 So.2d at 796, only testimony that D.W.W. had begun taking them to his sessions with his alcoholism therapist.

. Once again, the main opinion fails to include certain facts — that R.W. had decided to take the children to her parents' Methodist church and that R.W. and N.L. socialize almost exclusively with coworkers and family.

. As Justice Cook points out in his dissent, the trial court’s order is overly restrictive. It also fails to address holiday visitation, and it will prevent R.W. from spending even supervised time with her children at a park or shopping mall.